UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

BRIAN JOSEPH BOGART,

    Plaintiff,

v.                                                                        Case No:  6:12-cv-450-Orl-18TBS

COMMISSIONER OF SOCIAL SECURITY
and ROBERT E. ONEILL,

    Defendants.

## REPORT AND RECOMMENDATION[1]

Plaintiff brings this action pursuant to the Social Security Act ("Act"), as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Act.

I have reviewed the record, including the administrative law judge's ("ALJ") decision, a transcript of the proceedings, the exhibits, administrative record, and the pleadings and memoranda submitted by the parties. For the reasons that follow, I respectfully recommend that the Commissioner's final decision in this case be **reversed** and **remanded** for further proceedings consistent with the findings in this report, pursuant to sentence four of 42 U.S.C. § 405(g).

---

[1] Specific written objections to this report and recommendation may be filed in accordance with 28 U.S.C. § 636, and M.D. FLA. R. 6.02, within fourteen (14) days after service of this report and recommendation.  Failure to file timely objections shall bar the party from a de novo determination by a district judge and from attacking factual findings on appeal.

## I. Background

### A. Procedural History

Plaintiff has a high school education, which he obtained through special education classes. (Doc. 14 at 2). His past relevant work includes experience as a cook at a country club, a vending machine attendant, a kitchen helper, and a bakery prep worker. (Id. at 2-3). He filed for DIB benefits on July 10, 2009 and for SSI benefits on July 21, 2009. (Tr. 14). In both applications, he alleged disability beginning on June 30, 2009 due to depression, attention deficit disorder ("ADD"), delirium, learning problems, high blood pressure, high cholesterol, and hallucinations. (Tr. 175, 208). His application was denied initially and on reconsideration. (Tr. 62-67, 69-72). On November 23, 2010, at Plaintiff's request, a hearing was held before the ALJ who issued a decision on February 10, 2011, finding Plaintiff was not disabled. (Tr. 14, 29-57, 73-74). On January 24, 2012, the Appeals Council denied Plaintiff's timely request for review. (Tr. 1-5). He has exhausted his administrative remedies and this case is now ripe for consideration under 42 U.S.C. § 405(g).

### B. Relevant Medical Records

#### 1. Wuesthoff Medical Center/Suntree Psychiatry

On June 11, 2009, Plaintiff was evaluated by Nurse Practitioner Mary Ann Barnett, ARNP at Suntree Psychiatry. (Tr. 411). Plaintiff reported a history of ADD that was diagnosed when he was 6 or 7 years old. (Id.). Nurse Practitioner Barnett noted that Plaintiff struggled both with education when in school and with employment since he graduated from high school and that he had been fired from or quit at least 30 jobs since he graduated. (Id.). During the visit, Plaintiff complained of depression, feelings of

sadness, anhedonia, social isolation, anxiety, panic attacks, and recent weight gain. (Id.). A mental status examination revealed fair concentration with a need to be refocused at times, an inability to interpret proverbs, an inability to calculate nickels, and fair insight and judgment. (Tr. 412). Nurse Practitioner Barnett found no evidence of psychomotor retardation or agitation. (Id.). She diagnosed Plaintiff with attention deficit hyperactivity disorder ("ADHD") (inattentive type), major depressive disorder (recurrent and moderate), and anxiety and prescribed Cymbalta[2] and Vyvanse.[3] (Id.).

On June 30, 2009, Plaintiff was admitted to Wuesthoff Medical Center due to an altered mental status. (Tr. 300). While an inpatient, he exhibited psychotic features, mild rhabdomyolysis,[4] and hypertensive urgency. (Id.). He was Baker Acted due to acute delirium. (Id.). Plaintiff was discharged on July 9, 2009 with the following prescriptions: Catapres,[5] Norvasc,[6] Cardizem,[7] Protonix,[8] and Diovan.[9] (Id.).

---

[2] Cymbalta is an antidepressant used to treat major depressive disorder, general anxiety disorder, fibromyalgia, nerve damage in diabetics, and chronic musculoskeletal pain (http://www.drugs.com/cymbalta.html).

[3] Vyvanse is indicated for the treatment of attention deficit hyperactivity disorder (www.rxlist.com).

[4] The breakdown of muscle fibers resulting in the release of muscle fiber contents into the bloodstream, which may cause kidney damage (http://www.nlm.nih.gov/medlineplus/ency/article/000473.htm).

[5] Catapres is indicated for the treatment of hypertension (www.rxlist.com).

[6] Norvasc is used to treat high blood pressure and chest pain (www.rxlist.com).

[7] Cardizem is indicated for the treatment of hypertension and unstable angina (www.rxlist.com).

[8] Protonix is indicated for the treatment of gastroesophageal reflux disease (www.rxlist.com).

[9] Diovan is indicated for the treatment of hypertension (www.rxlist.com).

Plaintiff was readmitted to the hospital later the same day due to "ongoing psychosis." (Tr. 366). He was discharged in stable condition, with a GAF score of 70, on July 13, 2009.[10] (Id.). He was treated with Seroquel[11] and Klonopin.[12] (Tr. 367).

Nurse Practitioner Barnett conducted a mental status examination, which revealed that Plaintiff had poor eye contact, minimal speech, retarded psychomotor activity, a perplexed mood, a blunted affect, evidence that he was responding to internal stimuli, and limited thought content. (Tr. 407). She diagnosed schizophrenia paranoid type versus schizoaffective disorder and prescribed Klonopin and Abilify.[13] (Id.). On July 27, 2009, Plaintiff reported pacing, feeling restless, agitation, and poor sleep. (Tr. 404). Nurse Practitioner Barnett prescribed an increased dose of Klonopin and Cogentin.[14] (Id.).

 2. Circles of Care

Plaintiff began treatment at Circles of Care on July 20, 2009. (Tr. 417). He was seen for follow-up and treatment of his depression and ADHD. (Id.). He reported that he had an inability to sit still. (Id.). A mental status examination revealed slow, hesitant, and monotonous speech; a blunted affect; and fair to good insight and judgment. (Id.). Plaintiff

---

[10] A GAF score of 61-70 indicates some mild symptoms. Diagnostic and Statistical Manual of Mental Disorders 4th Ed. Text Revision ("DSM"), p. 34.

[11] Seroquel is typically used to treat delusions, hallucinations, unorganized thoughts, and hostility (www.rxlist.com).

[12] Klonopin is a benzodiazepine used to treat panic disorder (http://www.drugs.com/clonazepam.html).

[13] Abilify is indicated for the treatment of schizophrenia and bipolar disorder (www.rxlist.com).

[14] Cogentin is indicated as an adjunct in the treatment of Parkinsonism or tremors caused by other drugs (http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000595/).

- 4 -

was diagnosed with depression and psychotic disorder and was advised to continue on Abilify and titrate off Clonazepam. (Tr. 418).

Librada Porciuncula, M.D.[15] evaluated Plaintiff on August 17, 2009. (Tr. 415). He complained of being stiff, unable to sit still, feeling restless inside, having a sensation that he needed to get up and pace, and epigastric pain. (Id.). Dr. Porciuncula's mental status examination noted that Plaintiff had a stiff appearance, feelings of being uncomfortable around other people, low self-esteem, a constricted affect, a depressed mood, retarded psychomotor activity, and fair judgment. (Id.). Dr. Porciuncula diagnosed akathisia extrapyramidal symptoms[16] from Abilify, psychotic disorder, social anxiety disorder (ruled-out dysthymic disorder), and history of ADD. (Id.). She recommended that Plaintiff wean off Abilify, Cogentin, and Clonazepam and start on Pristiq.[17] (Tr. 416).

Plaintiff was examined by Dr. Porciuncula again on August 31, 2009, at which time he reported a recurrence of hallucinations and paranoia. (Tr. 414). He said he had thoughts of people outside his window shooting him. (Id.). Dr. Porciuncula diagnosed hypertension and schizoaffective disorder (bipolar type) and added Zyprexa[18] to Plaintiff's

---

[15] Dr. Porciuncula is a psychiatrist (www.ama-assn.org).

[16] Akathisia is an extreme form of internal or external restlessness. It may be a complete inability to sit still, with an undeniable urge to be moving constantly. Or it may be an entirely inner feeling of jitteriness or shakiness. Akathisia can be exhausting and debilitating. In fact, severe akathisia may put an individual at risk for suicide, simply because it can be so unbearable (http://schizophrenia.emedtv.com/extrapyramidal-symptoms/extrapyramidal-symptoms-p2.html).

[17] Pristiq is indicated for the treatment of major depressive disorder (www.rxlist.com).

[18] Zyprexa is indicated for schizophrenia and bipolar mania (www.rxlist.com).

medicine regime. (Id.). On September 29, 2009, Plaintiff reported that he was no longer having perceptual disturbances since starting Zyprexa. (Tr. 469).[19]

Plaintiff was treated by Dr. Porciuncula again on May 24, 2010. (Doc. 517). His mother said he was sleeping for long periods of time, he did not have any activities, he was very forgetful, and he had difficulty comprehending (he had blank stares). (Tr. 517). The mental status examination revealed no significant findings. Plaintiff was seen again on November 4, 2010 and Dr. Porciuncula increased his dose of Celexa.[20] (Tr. 542). He was seen again on January 26, 2011, at which time his dose of Zyprexa was increased. (Tr. 541).

3. Donald Stewart, Psy.D. - Examining Psychologist

On October 13, 2010, Plaintiff was examined by Donald Stewart, Psy.D, a clinical psychologist. (Tr. 537). Dr. Stewart interviewed Plaintiff regarding his medical history and reviewed medical records that were provided in connection with his evaluation. (Tr. 537-39). Dr. Stewart observed that Plaintiff had poor recall and complained of depression, ADHD, and difficulty focusing. (Tr. 538). Dr. Stewart administered the Kaufman Brief Intelligence Test[21] and Plaintiff's scores were as follows: a vocabulary IQ of 78, a non-verbal IQ of 62, and a composite IQ score of 72. (Id.). Dr. Stewart said the testing

---

[19] On December 1, 2009, Plaintiff was taken off of Pristiq and put on Effexor XR[19] because of changes in his insurance. (Tr. 468).

[20] Dr. Porciuncula took Plaintiff off of Effexor and switched him to Celexa (for depression) because of his fatigue. (Tr. 517).

[21] Professionals depend on the *Kaufman Brief Intelligence Test* (K-BIT) to measure both verbal and nonverbal ability that is appropriate for individuals age 4 to 90 (http://www.pearsonassessments.com/HAIWEB/Cultures/en-us/Productdetail.htm?Pid=PAa32300).

suggested the presence of a learning disabled process that was undiagnosed during Plaintiff's school years. Id.  A mental status examination revealed dysphoria, a depressed mood, a flat affect, significantly compromised recent and short-term memory, and poor insight and judgment. (Tr. 539).  Dr. Stewart diagnosed Plaintiff with schizoaffective disorder, borderline intellectual functioning, major depression, ADHD by history, and hypertension. (Id.). He concluded that Plaintiff's ability to sustain work related activities and follow directions were significantly compromised, and he recommended appointment of a guardian to administer any benefits awarded to Plaintiff.  (Id.).

Dr. Stewart also completed a Psychiatric/Psychological Impairment Questionnaire. (Tr. 529-536).  He diagnosed Plaintiff with schizoaffective disorder, borderline intellectual functioning, and major depression. (Tr. 529). Plaintiff's GAF score was 50[22] at the time and as low as 40[23] in the previous year. (Id.).  Dr. Stewart's clinical findings included poor memory, sleep disturbance, personality change, mood disturbance, emotional lability, delusions or hallucinations, anhedonia or pervasive loss of interests, psychomotor agitation or retardation, paranoia or inappropriate suspiciousness, difficulty thinking or concentrating, perceptual disturbances, social withdrawal or isolation, blunt, flat, or inappropriate affect, illogical thinking or loosening of associations, and decreased energy. (Tr. 530).  Dr. Stewart reported that his diagnoses were supported by diagnostic evidence

---

[22] A GAF score of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM, p. 34.

[23] A GAF of 31-40 is indicative of impairment in reality testing or communication (e.g., speech is at times illogical/irrelevant) or major impairment in several areas, such as work or school. DSM, p. 34.

of clinical interview, mental status examination, and IQ testing. (Id.). Plaintiff's primary symptoms were thought disorder, mood disorder, and intellectual deficits. (Tr. 531).

Dr. Stewart opined that Plaintiff was markedly limited (defined as effectively precluded) in his ability to understand, remember, and carry out detailed instructions; his ability to maintain attention and concentration for extended periods; and his ability to sustain ordinary routine without supervision. (Tr. 532). The doctor determined that Plaintiff was also moderately limited (defined as significantly limited but not totally precluded) in his ability to do the following activities: remember locations and work-like procedures; understand, remember, and carry out simple one or two step instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; make simple work related decisions; complete a normal workweek without interruptions from psychologically based symptoms and to perform activities at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel to unfamiliar places or use public transportation; and set realistic goals or make plans independently. (Tr. 532-534).

Dr. Stewart reported that Plaintiff experienced episodes of deterioration or decompensation in work or work-like settings that caused him to withdraw from the situation and/or experience an exacerbation of signs and symptoms due to cognitive deficits and guarded paranoid ideation that caused him to withdraw. (Tr. 534). Dr. Stewart

estimated that Plaintiff would be absent from work, on average, two to three times a month as a result of his impairments or treatment and that Plaintiff's symptoms and limitations described in the questionnaire were present since 2009. (Tr. 536).

### 4. Nancy MacKay, Psy.D. - SSA Consultative Psychologist

On October 26, 2009, Dr. MacKay evaluated Plaintiff at the request of the Commissioner. (Tr. 420). She conducted a mental status examination, which revealed that Plaintiff exhibited situational anxiety, decreased recall, difficulties with simple calculations, a decreased fund of knowledge, and an inability to interpret proverbs. (Id.). Dr. MacKay stated that the psychological testing was a valid representation of Plaintiff's functioning. (Id.). She administered the WAIS-IV[24] intelligence test and Plaintiff scored a verbal comprehension score of 77, a working memory composite score of 74, a processing speed composite score of 71, and a full scale IQ of 70. (Tr. 421). Dr. MacKay diagnosed major depressive disorder, recurrent, severe with congruent psychotic features; ADHD; predominately inattentive type; and borderline intellectual functioning. (Id.). Plaintiff's GAF score was 52.[25] (Id.).

### 5. Non-Examining State Agency Psychologists

Theodore Weber, Psy.D., a state agency psychiatrist, reviewed Plaintiff's file on October 29, 2009. (Tr. 422-438). Dr. Weber stated that the evidence supported diagnoses of borderline intellectual functioning, ADHD, schizoaffective disorder, psychosis, major depressive disorder (recurrent severe with congruent psychotic features), and an anxiety

---

[24] An intelligence test first released and put into use in 2008 (http://en.wikipedia.org/wiki/Wechsler_Adult_Intelligence_Scale#WAIS-IV).

[25] A GAF score of 51-60 denotes moderate symptoms. DSM, p. 34.

- 9 -

disorder. (Tr. 423-425, 427).  He opined that Plaintiff was moderately limited in his ability to perform activities of daily living; engage in social functioning; and maintain concentration, persistence, or pace. (Tr. 432).  The doctor also noted that Plaintiff had experienced one to two episodes of decompensation. (Id.).

In assessing Plaintiff's residual functional capacity, Dr. Weber determined that Plaintiff had moderate limitations in his ability to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting any behavioral extremes; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. (Tr. 436-437).

On March 15, 2010, state agency psychiatrist, Richard Willens, Psy.D. reviewed Plaintiff's file. (Tr. 471-488). Dr. Willens said the evidence supported diagnoses of borderline intellectual functioning, ADHD by history, psychotic disorder, schizoaffective disorder, major depressive disorder (recurrent with psychotic features), dysthymic disorder, and social anxiety disorder.  (Tr. 476-478, 480).  The doctor determined that Plaintiff had moderate limitations in social functioning and in concentration, persistence, or pace. (Tr. 485).  He also had mild limitations in activities of daily living and no episodes of decompensation.  (Id.).  Dr. Willens opined that Plaintiff had moderate limitations in his ability to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without

being distracted by them; complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and set realistic goals or make plans independently. (Tr. 471-472).

### 6. Relevant Testimony of Vocational Expert

Vocational Expert, Robert Laskey, (the "VE") testified that an individual of Plaintiff's age, education, and work history who was limited as described in his testimony would not be able to perform any work. (Tr. 55). The VE said an individual must be on task 70 to 80 percent of the workday to maintain competitive employment. (Tr. 55-56). He also noted that an individual could not miss work more than two days a month without termination. (Tr. 56).

## II. The ALJ's Decision

When determining whether an individual is disabled, the ALJ must follow the five-step sequential evaluation process established by the Commissioner and set forth in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4). Specifically, the ALJ must determine whether the claimant (1) is currently employed; (2) has a severe impairment; (3) has an impairment or combination of impairments that meets or medically equals an impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) can perform past relevant work; and (5) retains the ability to perform any work in the national economy. See Phillips v. Barnhart, 357 F.3d 1232, 1237-1240 (11th Cir. 2004). The claimant bears the burden of persuasion through

step four and, at step five, the burden shifts to the Commissioner. Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987); Phillips, 357 F.3d at 1241 n.10.

The ALJ determined at step one that Plaintiff had not engaged in substantial gainful activity since June 30, 2009, his alleged onset date. (Tr. 16). At step two, the ALJ found that Plaintiff suffered from the following severe impairments: borderline intellectual functioning, schizoaffective disorder, depression, anxiety, and ADHD. (Id.). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). (Tr. 17-18). The ALJ also determined Plaintiff's residual functional capacity ("RFC"). (Tr. 18-22). Finally, at step four, the ALJ decided that Plaintiff was capable of performing his past relevant work. (Tr. 22-23). Accordingly, the ALJ held that Plaintiff had not been under a disability within the meaning of the Act from his June 30, 2009 alleged onset date through the February 10, 2011 date of the ALJ's decision. (Tr. 23).

### III. Standard of Review

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards and whether the ALJ's findings are supported by substantial evidence. Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158 (11th Cir. 2004). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "more than a scintilla but less than a preponderance. It is such relevant evidence that a reasonable person would accept as adequate to support a conclusion." Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1178 (11th Cir. 2011) (citation omitted).

When the Commissioner's decision is supported by substantial evidence the district court will affirm even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the preponderance of the evidence is against the Commissioner's decision.  Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996).  The district court "may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner.]"  Id.  "The district court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision."  Foote, 67 F.3d 1533, 1560 (11th Cir. 1995) (per curiam); accord Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (the court must scrutinize the entire record to determine the reasonableness of the factual findings).

## IV. Discussion

A.  Listing 12.05(C)

Plaintiff argues that the ALJ failed to either (1) consider whether he met Listing 12.05(C), or (2) explain why he did not satisfy the Listing requirement.  (Doc. 14 at 13-14). The Commissioner argues that Plaintiff "failed to meet his burden of establishing he was presumptively disabled under Listing 12.05C[.]"  (Doc. 16 at 9).  After reviewing the record, I conclude that there is sufficient evidence to warrant the ALJ discussing Listing 12.05(C) and to compel an explanation of why the ALJ disregarded the Listing.

At Step 3 of the five-step evaluation process, the ALJ is called upon to determine whether Plaintiff's impairments meet a listing.  See 20 C.F.R. §§ 404.1520, 416.920. "To 'meet' a Listing, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings and the duration requirement." Wilson v. Barnhart, 284 F.3d 1219, 1224 (11th Cir.

2002) (citing 20 C.F.R. § 404.1525(a)-(d)).

A claimant bears the burden of proving that his impairment meets or is medically equivalent to a listed impairment. Wilkinson ex rel. Wilkinson v. Bowen, 847 F.2d 660, 662 (11th Cir. 1987); Hood v. Astrue, Civil No. SKG-08-2240, 2009 WL 4944838, at *5 (D. Md. Dec. 14, 2009). "When there is 'ample evidence in the record to support a determination' that the claimant's impairment meets or equals one of the listed impairments, the ALJ must identify 'the relevant listed impairments' and compare 'each of the listed criteria to the evidence of [the claimant's] symptoms.'" Hood, 2009 WL 4944838, at *5 (quoting Cook v. Heckler, 783 F. 2d 1168, 1172-73 (4th Cir. 1986)).

The introduction to the mental disorder listings differentiates Listing 12.05 from the other listings in the section. It states that:

> The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listing. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraph A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A).

To meet or equal Listing 12.05(C), Plaintiff must demonstrate (1) some mental retardation that manifested before the age of 22, (2) an IQ of 60 through 70 (either on a verbal, performance, or full scale), and (3) a physical or other mental impairment that imposes "an additional and significant work-related limitation of function." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05(C);[26] see also Davis v. Shalala, 985 F.2d 528, 531 (11th Cir.

---

[26] Listing 12.05(C) provides in pertinent part:

1993).

In assessing Plaintiff's RFC, the ALJ mentioned that Plaintiff was in special education classes. (Tr. 19). The evidence shows that Plaintiff's ADD symptoms first manifested at age 6-7 and were diagnosed through the school system although his mother refused to put him on medication for the condition. (Doc. 411). The ALJ failed to discuss whether this evidence indicated that Plaintiff had some mental retardation that manifested before the age of 22. The ALJ's written decision also omitted significant details from Dr. Nancy MacKay's medical opinion. The ALJ noted that according to Dr. MacKay, Plaintiff "suffered from major depressive disorder, recurrent and severe, with mood congruent psychotic features; attention deficit hyperactivity disorder; borderline intellectual functioning;[27] and a GAF score of 52." (Tr. 21). The ALJ afforded Dr. MacKay's opinion "great weight." (Tr. 22). But, the ALJ never acknowledged or discussed Dr. MacKay's finding that Plaintiff had a full scale IQ score of 70, which is evidence of the second

---

> Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> . . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05(C).

[27] The ALJ failed to discuss the validity or invalidity of the IQ score or attempt to reconcile it with the "borderline intellectual functioning" diagnosis. While the evidence "may not ultimately support a finding that [Plaintiff] meets the 12.05 listing requirements, it is the role of the Commissioner to make and explain that determination and not this Court." Hood, 2009 WL 4944838, at *6.

requirement of Listing 12.05(C). (Tr. 421).

The fact that Plaintiff graduated high school as a special education student and that he had trouble in school since the age of 6 or 7, when considered alongside his IQ score of 70 and his documented severe mental impairments, is sufficient evidence to trigger the ALJ's consideration and discussion of Listing 12.05(C). See Hood, 2009 WL 4944838, at *6 ("Given both [his] IQ score and [the doctor's] diagnoses, the ALJ should have considered and discussed the 12.05 listing requirement."). Whether the ALJ actually reviewed and considered all of this evidence is unknown because his written decision does not reflect such an analysis and omits important evidence like the full scale IQ score of 70. It would be improper for the Court to speculate about what, if anything, the ALJ considered but did not include in his written decision. Accordingly, I respectfully recommend that the district court reverse the ALJ's decision and remand the case on this ground.

B. Weighing Medical Opinions, Plaintiff's Credibility, and Past Relevant Work

Plaintiff's remaining arguments focus on the ALJ's alleged error in (a) failing to properly weigh medical opinion evidence, (b) failing to properly evaluate his credibility, and (c) finding that he could perform past relevant work. (Doc. 14 at 14-24). Because remand is required on the other issue raised by Plaintiff, it is unnecessary to review these additional objections to the ALJ's decision. Freese v. Astrue, No.8:06-cv-1839-T-EAJ, 2008 WL 1777722, at *3 (M.D. Fla. April 18, 2008) (citing Jackson v. Bowen, 801 F.2d 1291, 1294 n.2 (11th Cir. 1991)).

## V. Recommendation

Upon consideration of the foregoing, I respectfully recommend that:

1. The Commissioner's final decision in this case be **REVERSED and REMANDED** for further proceedings consistent with the findings in this report.

2. The Clerk be directed to enter judgment accordingly and **CLOSE** the file.

3. Plaintiff be advised that the deadline to file a motion for attorney's fees pursuant to 42 U.S.C. § 406(b) shall be thirty (30) days after Plaintiff receives notice from the Social Security Administration of the amount of past due benefits awarded.

4. Plaintiff be directed that upon receipt of such notice, he shall promptly email Mr. Rudy and the OGC attorney who prepared the Government's brief to advise that the notice has been received.

**RESPECTFULLY RECOMMENDED** in Orlando, Florida on July 25, 2013.

THOMAS B. SMITH
United States Magistrate Judge

Copies furnished to:

Presiding United States District Judge
Counsel of Record

- 17 -